UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISON

UNITED STATES OF AMERICA

v.

MARK KUEHN

CASE NO. 8:23-cr-166 SDM-JSS

18 U.S.C. § 371

**INFORMATION**

The United States Attorney charges:

**COUNT ONE**
**(Conspiracy to Defraud the United**
**States and Pay and Receive Kickbacks)**

**Introduction**

At all times material to this Information:

**The Defendant and the Relevant Entities**

1. MK Promotions, LLC ("MK Promotions") was a limited liability company formed under the laws of Louisiana with its principal place of business located in St. Tammany Parish, Louisiana. MARK KUEHN was the owner of MK Promotions. KUEHN paid kickbacks through MK Promotions to those he supervised in the scheme. KUEHN also received kickbacks through MK Promotions from Company 1.

2. Company 1 was a limited liability company formed under the laws of Florida with its principal place of business located in Sarasota County, Florida.

Company 1 purported to market cancer genetic ("CGx") testing to Medicare beneficiaries.

3. MARK KUEHN was a resident of St. Tammany Parish, Louisiana. MARK KUEHN worked for Company 1.

4. Individual 1 was a resident of Tuscaloosa County, Alabama. Individual 1 worked for Company 1.

5. Individual 2 was a resident of Tuscaloosa County, Alabama. Individual 2 worked for Company 1.

### The Medicare Program

6. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

7. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

8. Medicare covered different types of benefits and was separated into different "parts." Medicare Part A covered health services provided by, among

others, hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, including medical services such as office visits, minor surgical procedures, and laboratory testing, that were not procured through the payment of kickbacks and bribes, medically necessary, eligible for reimbursement, and provided as represented.

9. Physicians, clinics, and other health care providers, including laboratories (collectively, "providers"), that provided services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

10. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## Medicare Part B

11.   CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

12.   Novitas Solutions Inc. ("Novitas") was the MAC for consolidated Medicare jurisdictions that included Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.

13.   To receive Medicare reimbursement, providers had to make the appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal Anti-Kickback Statute ... and the ... (Stark law)).

14. CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

15. Payments under Medicare Part B were often made directly to the provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## Cancer Genetic Testing

16. Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

17. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal

5

cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

18. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

19. Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## The Conspiracy

20. From in or around June 2018, and continuing through in or around December 2020, the exact dates being unknown, within Sarasota County, in the Middle District of Florida, and elsewhere, defendant

## MARK KUEHN

knowingly and willfully conspired, combined, and agreed with others known and unknown to the United States:

   a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of HHS and CMS, in their administration and oversight of Medicare;

   b. to violate 42 U.S.C. § 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, in return for referring an individual to a person for the furnishing and arranging for the furnishing of cancer genetic testing, for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

   c. to violate 42 U.S.C. § 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, to a person to induce such a person to refer an individual to a person for the furnishing and arranging for the furnishing of cancer genetic testing, for which payment may be made in whole and in part by a Federal health care program, that is Medicare.

## PURPOSE OF THE CONSPIRACY

21. It was a purpose of the conspiracy for defendant **MARK KUEHN** and his co-conspirators to unlawfully enrich themselves by, among other things, (a) offering, paying, soliciting, and receiving kickbacks for the referral of Medicare beneficiaries to receive CGx testing; (b) submitting and causing the submission of false and fraudulent claims to Medicare; (c) concealing the submission of false and fraudulent claims to, and the payment and receipt of kickbacks in exchange for the

referrals of beneficiaries from, Medicare; (d) concealing the receipt of the fraud proceeds; and (e) diverting the fraud proceeds for the personal use and benefit of the defendant and his co-conspirators, and the use and benefit of others, and to further the fraud.

## MANNER AND MEANS OF THE CONSPIRACY

22. The manner and means by which defendant **MARK KUEHN** and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

23. It was part of the conspiracy that defendant **MARK KUEHN** would and did control MK Promotions.

24. It was further part of the conspiracy that defendant **MARK KUEHN** would and did contract with and work for Company 1.

25. It was further part of the conspiracy that **MARK KUEHN** and his co-conspirators would and did work with Company 1 in the identification and deceptive recruitment of Medicare beneficiaries.

26. It was further part of the conspiracy that defendant **MARK KUEHN** and his co-conspirators would and did solicit and receive payments in the form of illegal kickbacks and bribes from Company 1, in exchange for referring Medicare beneficiaries for genetic testing.

27. It was further part of the conspiracy that defendant **MARK KUEHN**'s co-conspirators would and did visit locations with foot traffic, such as grocery stores,

car lots, and other locations, in states including Alabama, Florida, Georgia, Louisiana, Mississippi, Texas, and others, in order to recruit Medicare beneficiaries.

28. It was further part of the conspiracy that defendant **MARK KUEHN** and his co-conspirators would and did identify Medicare beneficiaries at the aforementioned locations and recruited them for CGx testing that was procured through the payment of illegal kickbacks and bribes, not medically reasonable or necessary, ineligible for reimbursement, and not provided as represented.

29. It was further part of the conspiracy that defendant **MARK KUEHN**'s co-conspirators would and did wear white lab coats when approaching Medicare beneficiaries and used deceptive marketing techniques to deceive beneficiaries into believing that **MARK KUEHN**'s co-conspirators worked for a CGx testing laboratory.

30. It was further part of the conspiracy that defendant **MARK KUEHN**'s co-conspirators would and did obtain medical histories from Medicare beneficiaries and recorded such histories in a way to make it falsely and fraudulently appear as if the beneficiaries had symptoms of cancer.

31. It was further part of the conspiracy that defendant **MARK KUEHN**'s co-conspirators would and did complete medical requisition forms for, and obtained DNA swabs or "genetic specimens" from, Medicare beneficiaries in order to submit them to Company 1 and ultimately to laboratories for CGx testing.

32. It was further part of the conspiracy that defendant **MARK KUEHN** would and did supervise other individuals involved in the recruitment of Medicare beneficiaries for CGx testing that was procured through the payment of kickbacks and bribes and not eligible for reimbursement by Medicare.

33. It was further part of the conspiracy that defendant **MARK KUEHN** and his co-conspirators participated in meetings, performed various acts, and made statements to accomplish the objects of the conspiracy and to conceal the conspiracy.

34. It was further part of the conspiracy that defendant **MARK KUEHN** would and did utilize MK Promotions to offer and pay kickbacks to his co-conspirators in exchange for the referral of CGx samples from Medicare beneficiaries.

35. It was further part of the conspiracy that defendant **MARK KUEHN** would and did utilize MK Promotions to solicit and receive kickbacks from Company 1 in exchange for the referral of CGx samples to laboratories for CGx testing.

36. It was further part of the conspiracy that defendant **MARK KUEHN** and his co-conspirators facilitated the submission of false and fraudulent claims to Medicare that resulted in the payment of $4.5 million to various laboratories for CGx testing that was procured through the payment of kickbacks and bribes, not eligible for reimbursement by Medicare, not medically necessary, and not provided as represented.

## OVERT ACTS

37. In furtherance of the conspiracy and to achieve the objects thereof, defendant **MARK KUEHN** and his co-conspirators committed and caused to be committed the following overt acts, among others, in the Middle District of Florida, and elsewhere:

38. On or about November 12, 2018, defendant **MARK KUEHN** paid illegal kickbacks and bribes to Individual 1, through MK Promotions, totaling approximately $500 in exchange for recruiting Medicare beneficiaries.

39. On or about November 15, 2018, defendant **MARK KUEHN** received illegal kickbacks and bribes from Company 1, through MK Promotions, totaling approximately $4,225 in exchange for recruiting Medicare beneficiaries.

40. On or about July 9, 2019, defendant **MARK KUEHN** received illegal kickbacks and bribes from Company 1, through MK Promotions, totaling approximately $10,300 in exchange for recruiting Medicare beneficiaries.

41. On or about March 24, 2020, defendant **MARK KUEHN** received illegal kickbacks and bribes from Company 1, through MK Promotions, totaling approximately $3,420 in exchange for recruiting Medicare beneficiaries.

42. On or about November 4, 2020, defendant **MARK KUEHN** paid illegal kickbacks and bribes to Individual 2, through MK Promotions, totaling approximately $400 in exchange for recruiting Medicare beneficiaries.

All in violation of Title 18, United States Code, Section 371.

# FORFEITURE

1. The allegations contained in Count One are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of a conspiracy to violate 42 U.S.C. § 1320a-7b(b), in violation of 18 U.S.C. § 371, the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, which constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the offense.

3. The property to be forfeited includes, but is not limited to, the $251,010 in proceeds the defendant obtained as a result of the commission of the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
United States Attorney

GLENN S. LEON
Chief, Fraud Section
Criminal Division, Department of Justice

*John Scanlon*
John (Fritz) Scanlon, Assistant Chief
United States Department of Justice
Criminal Division, Fraud Section

Rachelle Bedke
Assistant United States Attorney
Chief, Economic Crimes